# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## AT NASHVILLE

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
|     **upon the relation and** | ) | |
|     **for the use of** | ) | |
| **TENNESSEE VALLEY AUTHORITY,** | ) | |
| | ) | |
|       **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CASE NO. 3:10-cv-00134** |
| | ) | **Judge Thomas A. Wiseman, Jr.** |
| **AN EASEMENT AND RIGHT-OF-WAY** | ) | |
| **OVER 7.11 ACRES OF LAND IN** | ) | |
| **ROBERTSON COUNTY, TENNESSEE,** | ) | |
| | ) | |
| **AND** | ) | |
| | ) | |
| **JACK B. JONES, MARY JONES his wife,** | ) | |
| **FARMERS BANK, JERRY TAYLOR,** | ) | |
| **TRUSTEE,** | ) | |
| | ) | |
|       **Defendants.** | ) | |

## REPORT OF THE COMMISSION

This commission appointed pursuant to Administrative Order number 75 of this court and Rule 71A(h) of the Federal Rules of Civil Procedure to determine the issue of just compensation for the taking of the property herein condemned files the following report.

1.     The Notice and Amended Complaint in this cause, with property description, were filed February 9, 2010. The order of possession, the investment order and the order appointing commissioners were entered shortly after that. The date of taking of this case was February 9, 2010.

2.     On September 27, 2011, the Commission met with the parties, their counsel and expert witnesses for a view of the property at the Jones tract.

3.      The trial of this matter commenced on September 28, 2011 at the offices of Jones, Hawkins and Farmer in Nashville, Tennessee, by agreement of the parties.

4.      By agreement of the Parties Commissioner Farmer was not present at the view and his presence was waived by both Parties.

5.      The take is specifically described in the Declaration of Taking (Docket No. 1-1) and the attached property description, as well as in Exhibit 1. the Plan and Profile Map. The take comprises a 7.11 acre easement. It is described as "Paradise – North Nashville No. 1 (East) Tap to Whitehouse, Tennessee, Substation Transmission Line. and designated as Tract PNEWH-14. The take includes guy wire rights. These wires extend outside of the easement area.  At the view it appeared that there were  guy wires running from two poles, specifically pole No. 514 at station 98+64.00 and pole 517 at  station 112+33.72. There are four other poles, Nos. 515, 516, 518, and 519 which do not have guy wires. Their locations and characteristics are denoted in the Plan and Profile Map, Exhibit 1., and the aerial photo Exhibit 2.,  but are within the existing easement for the transmission line.

6.      Exhibit 1 which is a full size copy of the plan and profile map describes the underlying easement as well as provides a physical description of the power lines and topography of the land.  It specifically lists the types of poles and structures which are on the easements described.  There is a pre-existing easement for a gas transmission line which crosses under the power line easement approximately at stations 113+97.7 through 114+ 59.1

7.      The following facts were stipulated:

A.      The size of the subject property is 334.78 acres.

B.      The date of take was February 9, 2010.

C.      The size of the easement itself was 7.11 acres plus guy wire rights.

D.    There are six poles on the property. (See. T.R. p. 36)

8.    Exhibits admitted at the hearing were as follows:

Exhibit 1    Plan and Profile Map;

Exhibit 2    Color map total tract aerial drawing;

Exhibit 3    Appraisal report of Terry Evans, 7/29/2011;

Exhibit 4    Photograph of easel showing the TVA easement;

Exhibit 5    Document titled "Landowner's Opinion of Value";

Exhibit 6    Report of Gary R. Standifer, 9/24/2011 (Marked for Identification);

Exhibit 7    Retainer letter to Gary R. Standifer from Philip Pfeiffer 11/23/2010;

Exhibit 8    Appraisal of Gary R. Standifer, 2/9/2010;

Exhibit 9    Appraisal of Gary R. Standifer, 2/9/2010-Supplemental Studies;

Exhibit 10    E-mail from Philip Pfeiffer to Clark Tidwell 9/25/2011 (Marked fro Identification);

Exhibit 11    Summary Appraisal Report of Mark G. Johnstone 2/9/2010;

Exhibit 12    Plaintiff's Resposne to defendant's Request for Admissions (for identification);

Exhibit 13    Color photographs;

9.    This case involved the acquisition of additional rights over an easement and right of way on 7.11 acres of land plus guy wire rights, more or less, in Robertson County, Tennessee. The total size of the tract from which the easement is taken, as stipulated,  is approximately 334.78 acres.  The parcel is able to be seen in the maps and in the various expert reports.  The

Commission also drove over and walked over a large area of the parcel with the parties at the viewing. The rights taken are more particularly described in the Declaration of Taking which is of record in this case as well as in the Plan and Profile Map, Exhibit 1. The land taken in the easement is dedicated by the Tennessee Valley Authority as tract number PNEWH-14. From the plan and profile map, Exhibit 1., as well as a review by the commission, the easement comprises 7.11 acres plus guy wire rights. The commission noted that the easement crosses the property approximately west to east in the approximate middle of the property viewed north to south. The easement has two turns within the Jones property. At the time of the hearing the poles, transmission lines and guy wires had been constructed. The power line has one 161,000 volt circuit of three wires with two aerial ground wires above it. There are a total of six single pole structures from approximately sixty feet to one hundred-fifteen feet tall on the property. Their locations without identifying location numbers are shown generally on Exhibit 2. aerial photograph/map. There are a number of guy wires going from two of the single pole structures. They occupy approximately .3 acres outside of the right of way. (See Exhibit 8., Standifer Report, p. 28) There is also a pre-existing gas pipeline easement across the property which runs under the power line easement as noted above.

10.     The land owners called Terry Evans to testify as an expert appraiser. He was allowed to testify as an expert and express opinions. (T.R. pp. 33 and 50) He indicated that the town of White House was about a half mile to the east on Highway 76. (T.R. p. 12) The properties in the area are residential and agricultural with some commercial. (T.R. p. 10) He went to the property on December 16, 2010. (T.R. p. 9) From 1990 to 2008 White House's population grew from approximately 3,000 people to 9,900. (T.R. p. 12) That does not include the persons living on the outskirts of White House. White House did its most recent annexation

4

the same month as the take in this case. (Ibid.) The annexation moved toward the subject property a quarter mile. (T.R. p. 13) The property is within the growth plan of the city of White House. (Ibid.)  Growth is projected to come west (T.R. p. 14) The subject property has 3,300 feet of frontage on Highway 76, 1,570 feet  on New Hall road, and 4,060 feet on North Mont Pleasant road. (T.R. pp.16-17) There is a total  of 8,930 feet of frontage. (T.R. p. 18) Road frontage helps the owner develop lots or the entire property. (T.R. p. 19) There is a new high school diagonally across Highway 76 from the subject. (Ibid.)  There is commercial and light industrial property north of highway 76 near the subject. (T.R. p. 20) Kroger and Walmart have built stores in White House in the last five or six years. (T.R. pp. 20-21) There is a gas pipeline easement on the property that is fifty feet wide and approximately 5,700 feet long. (T.R. p. 22) He subtracted the value of that easement from the value of the subject property. (Ibid.) [1]  The landowner cannot build over the easement. (T.R. p. 23) The highest and best use of the property is residential development. (T.R. p. 25) This is due to its road frontage, available infrastructure, location in relation to services and roads, and existing residential development. (Ibid.) He could divide it using the Farm Bureau Rule into five acre or more lots.(T.R. p. 26) The soil percs for septic tanks. (Ibid.) There is sewer available from the school and from the south. (T.R. p. 27) The power line easement divides the property into four quadrants after the gas pipeline easement and this creates a situation of overburdening of easements and a developer has to deal with the easements. (T.R. p. 30) Fears of radiation cause a need for a buffer zone. (T.R. p. 31)  He used the sales comparison approach as noted on pages forty-one to forty-five of his report. (T.R. p. 34) He indicated the before value of the property was $13,500 per acre based on the property across the road with limited frontage. (T.R. p. 35, and  Exhibit 3, p. 44) He subtracted 75% damage to

---

[1] There was a significant dispute, conflicting proof, and questions from the Commission regarding the number and location of the gas pipeline(s). The Report will address this below.

the gas pipeline easement (6.54 acres) from the price of the property. (T.R. p. 36) It caused a reduction of before value to $13,250 per acre. (T.R. p. 36) [2] Were the size of the gas pipeline easement doubled it would deceases it to approximately $13,000 per acre. (T.R. p. 38) The value of the easement acquired was either $83,625 or $83,000 depending on whether the pre-existing gas pipeline easement was fifty or one hundred feet wide. (T.R. p. 39)

11.    Mr. Evans indicated that there were incidental damages to the property due to obstruction of view, radiation, and the need for a buffer zone. ( T.R. p. 40) He indicated the studies show damage outside the easement or not, depending on who pays for them. (T.R. pp. 40-41 and Exhibit 3. Evans Report, p. 47) He indicated TVA siting criteria also showed a three hundred foot buffer. (T.R. p. 41) He indicated the Federal Energy Commission indicated further from the power line was better. ( T.R. p. 42)  Mr. Evans assigns four buffer zones, as noted on page 53 of his Report (Exhibit 3). He damages them as noted on page 50 of his Report. He damages all buffers at 50% of value. (Ibid. and T.R. pp. 42-44) The buffers are three hundred feet wide. (Ibid.) On cross examination he indicated the easement was  2,700 feet from Highway 76 and 1,900 feet from Mount Pleasant Road. (T.R. pp. 46-47) The land along the roads is level and the interior of the property is hilly. (T.R. pp. 49-50)  There were questions about the width of the gas pipeline easement with the distance between stations on the Plan and Profile Map being about sixty-one feet. (T.R. pp. 53-54) The witness indicated that based on the City of White House the easement was fifty "something" feet wide.  (T.R. p. 55) He indicated where the easement is and what is mowed can be different. (T.R. p. 56) [3] The subject property is in the unincorporated growth area of White House. (T.R. p. 62) Mr. Evans indicated the City of White

[2] The Government contends the pre-existing gas pipeline easement is 100 feet wide. (T.R. p. 36) As noted above the Report will deal with this below.

[3] The Government indicated the gas pipeline easement was of "undefined" width. (T.R. p. 56) Further the distance between the centerline of the pipes, according to the plan and profile map is 61.4 feet. (See Exhibit 1.) See also discussion about the gas pipeline easement on pp. 56-61 which does not establish an easement width.

House planner had indicated if Mr. Jones wanted to have his property on Highway 76 zoned commercial they would likely do it. (T.R. p. 64) White House will not make plans on where they run sewer until they have a proposal. (T.R. p. 65) He did not value the property based on the proposed Union Road exit on the interstate. (T.R. p. 67) He did not consider the golf course during his appraisal. (T.R. p. 68) He indicated the school property was diagonally across the road and .36 miles away. (T.R. p. 68) Significant commercial development is on the other side of the interstate. (T.R. p. 69) There is a one hundred acre commercially zoned area with no development on it between the Jones property and the interstate. (T.R. p. 70) It has a power line on it. (Ibid.) He indicated that with the changes in the real estate market the prices were generally back to where they were in 2005 and his comparable sales are from before the downturn. (T.R. p. 75) He did not cite studies for his damage figures. (T.R. p. 77) He indicated his report on page 47 notes some studies say there are health risks from power lines and some studies say there are not. (T.R. p. 78) He indicated there were no electro-magnetic-fields (EMF) limits but there were in other states. (T.R. p. 80) He indicated studies are out of sync because land owners are not asked what they knew about risks when the sale took place. (T.R. p. 82) He referenced an IRWA study that showed up to ten percent damage to residential properties. (T.R. pp. 83-84) The lines there were larger than these lines. He indicated the basis of his testimony on damages was,

"it's directed to the -- related to the cost of development, increased cost of development, the loss of the use of some of this land, the fact that it is close to a power line, and there is some fear out there with regard to that, with a long road frontage we had that would allow us to develop it. All of those things play a part in the property."

(See. T.R. p. 88)[4] He agreed one of the studies said it could affect property values negatively five to fifteen percent. (T.R. p. 93) He indicated his overall damage to the subject property was six percent and the study showed damages of less than ten percent. (T.R. p. 94)

---

[4] Mr. Evans' references to studies he reviewed are at pp. 47-49 of his report, Exhibit 3.

Mr. Evans referenced his statement at the bottom of page forty-nine of his report where he indicated a buffer area three hundred feet wide was "necessary and prudent". (T.R. p. 103, Exhibit 3. p. 49) He indicated the siting constraint called for a three hundred foot around occupied buildings. (T.R. p. 111) Mr. Evans applied three hundred feet from the edge of the right of way. (T.R. p. 112) He indicated there are developments in Robertson County where developers have had to make lots bigger because of power lines. He did not know exactly how much bigger. (T.R. p. 115) Some buildings are within three hundred feet. (Ibid.) On redirect he indicated he referenced the studies in his report so the Commission would know others have the opinion power lines damage property outside the right of way. (T.R. p. 116)     In response to a question from the Commission he indicated the power line easement worsens the effect of the gas pipeline easement and vice versa. A road can be built over the gas pipeline. (T.R. pp. 117-118) He indicated that the problem was not that the quadrants were landlocked but that problems were created by the irregular shapes caused by the easement location and where  roads could be placed and the expense of that as well as lot placement issues. (T.R. p. 118) He also indicated the east side of the interstate around White House developed first because of the availability of infrastructure. (T.R. p. 119) New development will have to be on the west side of the interstate because the other infrastructure is exhausted and the west side is where the land is. (T.R. p. 119)

12.     Mr. Evans' Report was consistent with his testimony. He had three comparable sales. They were the Fox to MFP Properties sale wherein 25.90 acres sold on August 29, 2007 for $500,000 or $19,305 per acre; the Escue to Robertson County sale wherein 54.12 acres sold on May 4, 2005 for $649, 440 or $12,000 per acre; and, the Jones to Broadrick sale wherein 20.11 acres sold on May 22, 2002 for $232,500 or $11,561 per acre. After adjustments he deemed the per acre value of the subject to be $13,500.

13.     Mr. Jack B. Jones, the landowner, was called as a witness. He owns the subject property and one hundred additional acres across Mount Pleasant Road. He has lived there over thirty years and is across the street from the subject. (T.R. p. 121) White House has a low crime rate. (T.R. p. 124) He does not know of engineering drawings or of land having been acquired by the Tennessee Department of Transportation for the proposed interchange at Union Road and I-65. (T.R. p. 126) Highway 76 in front of the new high school was widened within the last two years. (T.R. p. 127) The property for the high school was sold by Mr. Alvin Escue. He received $12,000 an acre for it and he held the note. (T.R. p. 128) The gas pipeline was put in in the sixties, it is fifty feet wide and Mr. Jones mows it. He keeps it wider. (Ibid. and 129) On the date of the view there was equipment at the gas pipeline site on Highway 76 that is used for cleaning. It is portable and is only there for a day. (T.R. pp. 129-130) Mr. Jones inherited his property in 1978 and his family had owned it since 1850. (T.R. pp. 130-131) He has not seen them lay a second pipeline. (Ibid.) He knows of no incidents, ruptures or explosions. (T.R. p. 132) He mows the area to the trees, not to be a particular width, and it is not something the gas company exercises dominion over. (T.R. p. 133) He indicated the sewer is at either the new school or the White House water treatment plant on Industrial Drive. ( T.R. p. 134) There is also sewer at Bear Creek, and both it and the school sewer are approximately a mile away. (T.R. p. 135) The Pleasant Valley subdivision across the road from his property are two to six or seven acre lots and have no trouble percing. (T.R. pp. 135-136) The White House growth plan includes 279 acres of his property and would include the other 54 acres at his request. (T.R. p. 137) The property is green belted and flat or rolling. (T.R. p. 138) The highest and best use is for development, either residential or commercial (T.R. pp. 140-141) He opined the property was worth $15,000 an acre on the date of take. (T.R. p. 142) He indicated the property as a whole was

diminished in value ten percent    or $502,170 in damages, with the before value being

$5,021,700 and the after value being $4,519,530. ( T.R. p. 142 and Exhibit 5.) The ability to

develop the property was made more difficult by the location of the easement in relation to the

property boundary in the fifty-four acre part. (Ibid.)

14.    On cross examination he agreed he had some grades on his property that went up

seventy feet in five hundred feet and also indicated the property was flatter in other areas closer

to the road. (T.R. p. 148) For comparable sales he considered the sale by Mr. Escue to the county

for the high school and the property bought by Mr. Broadrick from Ms. Jones in 2002. (T.R. pp.

148-150)  In explaining why he damaged the property ten percent he said,

> "A.  I'm saying it takes 10 percent on the whole property, and there's a lot of factors.  One
> of those factors is the TVA line  itself.        The TVA line being in place regardless of the
> distance to the point can have an effect on who would want to purchase this property and what
> type of construction or use they would use for this property, because they -- they could be under
> the influence, this might affect what went on back here.  So you've got to look at this thing as a
> whole picture."

(See, T.R. p. 152)

He indicated he was aware of prices paid to his neighbors for the easements that crossed their

land. (T.R. p. 154) He indicated there were either two or three markers where the gas pipeline

crosses roads. (T.R. p. 155) There was then extensive discussion with the Commission about

whether there were one or three pipelines under the easement. (T.R. p. 157-158) In response to a

question from the Commission he indicated the basis of his ten percent damage figure was loss

of lots, reconfiguring roads, the view of the lines, the effect of the lines on livestock, and the

relation of the easement to the property boundary. (T.R. pp. 160-161) The landowner rested his

case.

15.    At the beginning of the Government's proof the Landowner made an oral motion

to disqualify Mr. Standifer as a witness because he had not valued the land as a whole but rather

as two separate parts and also because he had written a letter regarding the TVA site selection process and the buffers that disqualified him as an expert witness because of bias. The Commission took the first part of the Motion under advisement in order to hear Mr. Standifer's testimony. The Commission granted the landowner's Motion to deny admission of Exhibit 6 (marked for identification only) since it was not timely disclosed under Rule 26 (a)(2) F.R. Civ. P. and Local Rule 12 (c)(d)(6) and no leave of Court was sought to submit it. (T.R. pp. 158 and 173)

16.     Gary Standifer was called as an expert witness by the Government. He was allowed to testify as an expert without objection. (T.R. p. 175) He valued the entire property as a whole before the take at $3,500,000. He valued the property after the take at $3,434,500. Just compensation due the landowner was $65,500. His total percentage of damage was 1.9 or 2 percent. (T.R. p. 175) He broke out 279.9 acres of the 334 and valued it separately as a component of his damage to the entire tract, explaining,

"A.  The 279.9, in my opinion, had a higher value, so I broke that out as a separate parcel, the reason being, it had extensive frontage on Highway 76, it had frontage on New Hall Road, and it had extensive frontage along North Mount Pleasant. This parcel here was -- or this area here was actually delineated by two separate tax parcels, Parcel 55 and 56.  These parcels had access by this -- this area here leading back to the property. In my judgment, I felt like that it was appropriate to break this out as a different unit of valuation as compared to this area here because of the extensive -- extensive road frontage, so I valued it as a distinct and separate parcel.  It basically has the same highest and best use based on my highest and best use analysis.  But I felt that I had a somewhat lower per-acre value, and I broke it out in order to value it in that manner."

(See T.R. p. 176)

He treated the divided parcels differently because of topography and what he saw as access issues. (T.R. p. 178) He agreed on questions from the Commission that too much breaking up of land into smaller parcels in the valuation process "could be abuse" but that was not his intent. (T.R. p. 180) He broke it into two parcels because it was a large property and that would yield

the highest value. (T.R. p. 182) The area he cut off, the fifty-four acre area, would have larger acreages when sold and would need an access road. (T.R. p. 183) He used larger sales to compare to the larger portion since he felt they were more comparable. (T.R. p. 184) His comparable sale No. 5 wherein 124.45 acres sold from the Cook Family Trust to A & J Development on February 15, 2007 for $1,866,750 or $15,000 per acre he seemed to discount saying the sewer had to come one thousand feet, whereas he noted the subject had sewer one thousand five hundred feet away (See Exhibit 8. P. 16), and the Cook to A&J sale did not have roads or sewer on it when it sold, nor was the slowness of subdivision lot sales relevant to the price at sale. (T.R. pp. 185-186) He said it had a superior location and closer sewer. (T.R. p. 186) The sale was considered at "face value" (T.R. p. 187)    He adjusted his sales based on location, size, shape, depth, and access topography and arrived at per acre value of $11,000 per acre. (T.R. p. 190) He said he thought the gas pipeline easement was one hundred feet wide. (T.R. p. 190) He measured the gas pipeline easement from the aerial photograph. (T.R. p. 191) The extent of his knowledge about the number of pipelines is the TVA plan and profile map (Exhibit 1.) and the markers he observed. (T.R. p. 192) He looked at the easement document and it does not specify the width of the easement or the number of pipelines. (T.R. p. 193) One hundred feet for the easement was an "estimate". (T.R. p. 194) He estimated the gas pipeline easement at 8.4 acres of his larger parcel  based on his estimated one hundred feet width. (T.R. p. 195) He adjusted the property value downward $65,000 for the easement or a percentage adjustment of 2.1 percent (2.1%). (T.R. p. 196) He adjusted his smaller parcel value for a size of the gas pipeline easement on that of 4.5 acres and he had a total before value for the fifty-four acre tract of $465,570 for a total before value of the entire Jones tract of three and one half million dollars ($3,500,000).  (T.R. p. 197) He felt the interior land would develop in ten to fifteen acre tracts.

(T.R. p. 197) He estimated the distance from the easement boundary to the property boundary was two hundred forty feet. (T.R. p. 198) In the area north of the easement to the boundary of the fifty-four acre part there were ten acres. (T.R. p. 200) He felt similar sized tracts were saleable. (T.R. p. 200) He indicated there were also sales consistent with the eight and twenty-three acre areas he found around the power line easement. (T.R. p. 202) In his opinion homes could be located in these areas without being too close to the power line. (T.R. p. 202) The line did not interfere with dividing the property. (Ibid.) He felt electro-magnetic fields (EMFs) would not interfere with home construction. (T.R. p. 203) He felt his Bethlehem Road study which looked at lots encumbered by a power line approximately two miles north showed that the power line did not cause damage outside the easement area right of way. (T.R. p. 207) He felt he controlled his variables and used matched sets. (Ibid.) He also indicated he felt the Mansker Farms subdivision in Sumner County showed that houses could be built next to a power line right of way. (T.R. p. 208) He saw the same effect for Willow Creek. (Ibid.) He also felt that as long as the line easement did not leave a small size or "odd shape" it did not diminish utility. (T.R. pp. 212-213) He damaged the right of way for the easement at eighty-five percent (85%). (T.R. p. 214) He also assessed damage for danger trees at $6,000. (Ibid.) He also allowed damage for an area around guy wires at the same rate as the easement. (T.R. p. 215) he noted the area of the subject affected was about two percent and he damaged the property about one point nine percent of its value. (Ibid.)

17.     On cross examination he indicated his fee was $10,000. (T.R. p. 218) He also bills for trial and pre-trial activities at $225 per hour. (T.R. p. 219) He sent a draft of his September 24th letter to TVA Counsel for comments. (T.R. p. 221) It became apparent that Mr. Standifer had purposefully not disclosed his compensation. (T.R. p. 227)   He got forty to fifty thousand

dollars from TVA in the last year. (T.R. pp. 230-231) Rule 26 (a)(2)(B)(v) requires disclosure of compensation n by expert witnesses. (T.R. p. 231) On further cross he indicated he valued two larger parcels which comprised the Jones property. (T.R. p. 237) He had two different per acre values. (T.R. p. 238) The Jones property meets the three tests for the larger parcel rule, i.e., common ownership, congruity or contiguousness, and unity of use. (T.R. p. 240, see also page 2 of Exhibit 8.) His use of two parcels is based on his contention that access to the fifty four acre parcel is through a "neck" from Highway 76. (T.R. pp. 240-241 and Exhibit 8. p. 2.) He contended that he could use smaller parcels because the use was different due to road frontage and larger tracts, even though residential. (T.R. p. 243) He indicated there was a different value for the use and he used different comparable sales. (T.R. p. 244) He valued the smaller tract at $9,000 an acre and the larger tract at $11,000 an acre. (T.R. p. 245) The smaller parcel is not landlocked. (T.R. p. 246) He felt the property was not "overburdened with easements by the imposition of the TVA easement because it could still be used for residential purposes. (T.R. p. 249) There is no "neck" due to physical or boundary issues because there is unity of ownership. (T.R. p. 252) He counted the "neck" in the smaller fifty-four acre parcel. (T.R. p. 253) The deed to the Jones property did not specify the width of the gas pipeline easement and he did not get the easement deed. (T.R. pp. 254-255) He assumed the TVA survey on which he relied was accurate. (T.R. p. 255) He changed some wording in his report based on conversations with Government counsel.(T.R. p. 258) He valued the gas pipeline easement at seventy percent loss of value. (T.R. p. 259) His value was based on his experience. (Ibid.) He does not have a study that deals with larger parcels versus larger parcels. (T.R. p. 261) He said one of his studies indicated sales of townhouses on either end with one being close to a power line showed no difference in price. (T.R. p. 262) On Redirect he stated that if he valued the two parcels together it would have

had a lower value. (T.R. p. 271) He asked Government counsel for a copy of the Request for Admissions. (T.R. p. 274)

18.    At the end of Mr. Standifer's testimony the Landowner renewed his Motion to Disqualify him as a witness. The Landowner's reasons were that the ***Instructions*** require the Commission to value the land as a whole and Mr. Standifer violated the unit rule. The Government responded that Mr. Standifer was following the market. The Commission Denied the Motion and Mr. Standifer was not disqualified. (T.R. p. 285) The issues raised in cross examination will go to the weight.

19.    Mr. Standifer used nine comparable sales which were Everett to Hulsey wherein 91.56 acres sold on February 14, 2006 for $800,000 or $8,737 per acre; Kelly to Slagle wherein 40.0 acres sold on January 19, 2007 for $400,000 or $10,000 per acre; Church of the Firstborn to Kelly wherein 88.85 acres sold on October 16, 2006 for $641,250 or $7,217 per acre; Neal Trust to MFP Properties wherein 25.90 acres sold on August 29, 2007 for $500,000 or $19,305 per acre; Cook Family Trust to A&J Development wherein 124.45 acres sold on February 15, 2007 for $1,866,750 or $15,000 per acre; Estate of Graves to Day and Spicer wherein 78.99 acres sold on January 7, 2008 for $541,846 or $6,860 per acre; Swann to Bond wherein 112.42 acres sold March 29, 2007 for $825,000 or $6,004 per acre; Zane to Lazy J Investments wherein 49.33 acres sold on January 6, 2010 for $450,000 or $9,122 per acre; and Farmers Bank to Eden wherein 36.091 acres sold on December 30, 2009 for $484,000 or $13,411 per acre. (Ex. 8. p. Addenda F.)

20.    Mr. Standifer also had a number of studies, (Exhibit 9.) seven in total, which he concluded showed houses were built in close proximity to power lines, the view of a power line did not affect lot value, there is no damage outside the right of way to lots near a power line,

power lines do not diminish development potential, one which suggested power lines cause lots to lose forty-five percent of value if viewed simplistically but which really showed no loss of value outside the right of way according to him, and showed no adverse affects due to an adjoining line. Mr. Standifer's Study 1 (See, Exhibit 8., Standifer Report, pp. 20-25, and,Exhibit 9, Supplemental Report summarizing studies.) shows a series of pictures of houses in the vicinity of power lines. Study 2 is a paired set study that shows lots on Bethlehem Road approximately two miles from the subject which showed 83.4% damage within the right of way of a power line. Study 3 is a paired set study he indicated showed no damage outside the right of way to lots near a power line. Study 4 is a series of photographs of subdivisions he said shows power lines do not diminish development potential. Study 5 is a matched pair study which he said indicated that the use of the extraction principle would show no damage outside the right of way. Study 6 is a study from Stonebridge Park in Williamson County involving H frame structures which he stated showed no damage to lots away from a power line. Study 7 is a study of five town home sales in the Villas at Concord Place in Davidson which he said showed townhomes next to an easement brought a premium price, possibly due to available open space.

21. Mark G. Johnstone was called as a witness by the Government. It was stipulated he could testify as an expert. (T.R. p. 286) His appraisal report was admitted as Exhibit 11. He indicated the before value of the property was $2,678,000. (T.R. p. 286, Exhibit 11. p. 27) The after value was $2,624, 000. Damages were $54,000. (T.R. p. 287) He indicated thirty-seven building permits were issued in White House in 2010, the trend was downward in 2009 and there are forty-four units a year projected to be built through 2025. (T.R. pp. 287-288) He indicated the proposed interchange at Union Road would not be built. (T.R. p. 289) He used the sales comparison approach. (T.R. p. 290, and Exhibit 11.) He looked for sales from 2008 to 2010 and

he looked for tracts of fifty acres close to transportation corridors. (T.R. p. 291) He had four comparable sales. (T.R. p. 292 and Exhibit 11., pp. 19-23) He did not use the sale from Mr. Escue for the high school because it had a different highest and best use. (T.R. p. 293) Sales of twenty acres were too small. (Ibid.) His value as of the date of take was $8,000 per acre. (T.R. p. 294) This yielded a before value for the property of $2,678,000. (Exhibit 11. p. 4) He put the most emphasis on Sale 1. which was a month before the date of take. (T.R. p. 294, Exhibit 11., p. 20) He did not value the property as smaller tracts because he said there was no market segmentation for smaller tracts. (Ibid.) He looked at loss of present utility and saw the property could be used in a variety of ways; and, he looked at loss of future utility and saw the areas outside of the easement could be developed. (T.R. pp. 296-298) He indicated that there was no damage outside the right of way based on the siting guidelines because they are not market based. (T.R. p. 298) The third factor he considered was accessory rights and the fourth was the obligations of the parties. (T.R. pp. 300-301) He damaged the permanent easement and right of way at ninety-five percent due to transmission wires, guy wires, and danger trees. (T.R. p. 301) He picked higher damage rate, i.e., ninety-five percent (five percent higher) due to guy wires and danger trees outside the right of way and because his study showed no damage outside the right of way. (T.R. p. 302) He picked a higher damage to reflect the damage outside the right of way and it was five percent (5%). (T.R. p. 302) He indicated he had based his adjustment for the gas pipeline on there being three gas pipelines and he indicated his report showed this citing pictures on page thirty (Exhibit 11., pp. 20, 22, 30 and 442 and T.R. pp. 304-316) He made a qualitative, not a quantitative, adjustment for the presence of the gas pipeline easement. (T.R. p. 317) He indicated there was no reason for there not to be three pipelines based on what he observed. (T.R. p. 316) The easement deed did not say whether it was sixty-one feet or one hundred feet or how

far outside the right of way it was. (T.R. p. 315) He indicated the numbers on the three orange markers circled on Exhibit 11. at page thirty were 564-2, 564-1 and 865-1. (T.R. p. 305) These numbers are not readable from the picture. The numbers were not in his report. (T.R. p. 306)

22.     On page eighty-two of his report (Exhibit 11.) he used what he described as paired data analysis to examine the effect of easements on property. (T.R. p. 318) The study told him there was no effect outside the easement. (T.R. p. 320) He also indicated the easement would be damaged one hundred percent doing it that way and that cannot be done so he damaged the easement at ninety five percent. (T.R. p. 320)  He indicated his sales were as close to matched pairs as he could get. (T.R. p. 322)  He indicated there were no true matched pairs and he made adjustments for the differences which were either that they were larger or had a transmission line easement on them. (T.R. pp. 321-322) He was asked, "No need for any adjustment, because you say they are all exactly alike or close enough to where you don't need to make any adjustments, right? THE WITNESS:  Yes." (T.R. p. 324) He further indicated that based on another of his studies, Stones Manor and The Reserve at Oakland in Montgomery County, that developers were not paying less for land with a power line on it. (T.R. p. 326 and Exhibit 11. p. 83) He said his study showed developers were paying more for land with a power line on it. (Ibid.) He said his study showed a market based adjustment did not need to be paid for land outside the right of way. (Ibid.) He indicated the $200,000 difference in the total price would not be significant. (T.R. p. 328)

23.     On cross he indicated he sends his bill for trial work to Mr. Pfeiffer. (T.R. p. 335) On pages nine and ten of his Report (Exhibit 11.) that the gas pipeline easement was a typical utility easement.(T.R. pp. 334-335) He considered the property as a whole. (T.R. p. 336) The road frontage of the Jones property that he noted was 8,970 feet or close to that, which is "a large

amount of road frontage.". (T.R. p. 337) He relied principally on his sale No. 1., the Zane to Lazy J Investments sale, which sold for a little over $9,000 per acre. (T.R. p. 337) That sale has 1,579 feet of road frontage. (T.R. p. 338) He did not subtract from the landowner's compensation for the "small little area" where the power line crossed the gas pipeline easement was. (T.R. p. 339) He does not agree the gas easement makes the Jones property more difficult to develop. (Ibid.)  He indicated Exhibit 13. was a series of photographs of the power line on the Jones property. (T.R. p. 340) On redirect he indicated the market data did not indicate a segmentation of the Jones property into two tracts so he did not do that.(T.R. p.  342) He made a slight adjustment for road frontage in his sale No. 1. (T.R. p. 343) He indicated that the Jones property could be developed as others in Robertson County are. (T.R. p. 344)

24.     Mr. Johnstone used four comparable sales. They were the Zane to Lazy J sale on January 6, 2010 wherein 49.327 acres sold for $450,000 or $9,123 per acre, the Hefner to Doubleday  sale on November 30, 2009 wherein 286.680 acres sold for $1,147,720 or $4,000 per acre, the Jones to Sandarangani sale on December 19, 2008 wherein 101.130 acres sold for $550,000 or $5,439 per acre, and,  the Underwood to Day/Spicer sale on January 7, 2008 wherein 78.990 acres sold for $541,846 or $6,860 per acre. (Ex. 11., p. 20) From these Mr. Johnstone concluded that the subject property was worth $8,000 per acre on the date of take. (Ex. 11., p. 23)

25.     All appraiser experts used the sales comparison approach to valuation. The Fox to MFP sale and the Zane to Lazy J sales come closest to meeting the     requirements for comparability. "[C]omparability is a function of three variables: the respective characteristics of the properties, their geographic proximity to each other, and the closeness in time of the sales."

_United States v. 68.94 Acres of Land,_ 918 F.2d 389, 399 (3d Cir .1990)[5]; Unif. Appraisal Standards 47 (specifying nine "basic elements of comparison": property rights conveyed; financing terms; conditions of sale; market conditions; location; physical characteristics; economic characteristics; use and zoning; and non-realty components of value included in the sale property). There were three somewhat commonly used comparable sales. These included the Fox to MFP Properties sale wherein 25.90 acres sold on August 29, 2007 for $500,000 or $19,305 per acre which was used by Mr. Evans and Mr. Standifer; the Zane to Lazy J Investments wherein 49.33 acres sold on January 6, 2010 for $450,000 or $9,122 per acre, which was used by Mr. Standifer and Mr. Johnstone; and the Escue to Robertson County sale wherein 54.12 acres sold on May 4, 2005 for $649, 440 or $12,000 per acre which was used by the Landowner Mr. Jones and Mr. Evans. The Escue to Robertson County sale was more remote in time and possibly had some elements of special financing with the landowner holding the note so the Commission credits it with less comparability than the other two. These three sales present a series of questions concerning comparability. The Zane to Lazy J sale is closest in time, i.e., one month prior. It is however much more remote in distance The Escue to Robertson County sale is closest in distance, i.e., .36 miles. It is also the largest of the three. The Fox to MFP sale is between the other two in distance but still substantially closer than Zane to Lazy J. It is, however, a smaller sale, being half the size of the other two, but it has the most road frontage, i.e., 2,300 feet, and the subject property has a very substantial amount of road frontage, but somewhat less per acre. All sales are substantially smaller than the subject which is 334.78 acres, however, they

---

[5] The Commission notes that it has repeatedly asked the Parties and their attorneys to have appraisers note the distance from their comparable sales to the subject property. The Landowner's appraiser, Mr. Evans did so. Neither of the Government's appraisers, both experienced appraisers, who should know better, chose to merely identify a location and provide a map with no distances. The Commission asks for distances to be identified for a reason as noted in _United States v. 68.94 Acres of Land,_ 918 F.2d 389, 399 (3d Cir .1990) and the Uniform Appraisal Standards above. While it is helpful to see a map, which all appraisers have, it is not helpful to not have distances to properties noted.

are all of a substantial size. Zoning is the same for all. Zane to Lazy J is closest in time but is clearly not close to White House. Physical characteristics are close for all. The Escue to Robertson County sale had a sale condition of the seller holding the note for the County, a special financing condition to the benefit of the seller. Property rights conveyed were the same. Even though the Escue sale was across the street, literally, it was five years removed in time and in a very different real estate market. The Fox to MFP sale was a substantially smaller sale and was also more removed in time. The Zane to Lazy J sale was farther away, but, it was a larger parcel, almost fifty acres, and it was very close in time and after the downturn in the real estate market. It also had substantial road frontage as did the subject. The Commission deems the Zane to Lazy J sale and the Fox to MFP sale as the most comparable sales, especially since they were used by both the Landowner's and the Government's appraisers or both Government appraisers.

26.     Mr. Evans used the term overabundance as a description of overburdening in his assessment of damage relative to the interaction of the gas pipeline easement and the power line easement. The concept of "overburden" as applied to easements has been discussed by a number of courts, notably in several recent opinions of the Tennessee Court of Appeals. In *Regen v. East Fork Farms, LP*, 2009 WL 3672788 (Tenn. Ct. App. 2009) the Court noted that for there to be an overburden there must be additional burden as opposed to merely an increase in the degree of the burden. (*Ibid*. p.3. citing *Shooting Point, LLC, v. Westcoat*, 265 Va. 256, 576 S.E.2d 497, 503 (Va. 2003))   Further , in *Rawdon v. Johnston*, 2010 WL 4867451 (Tenn. Ct. App. 2010) the court noted that where there is no significant change in the use contemplated for the easement that has occurred there is no overburden, ( See, *Ibid*. p. 3, citing *Carbone v. Vigliotti*, 222 Conn. 216, 610 A.2d 565, 569 (Conn. 1992).) Or as noted by the Court in *Regen v. East Fork Farms*, supra, at p. 3, 'an increase in traffic over an easement in the process of normal development of

the dominant estate, in and of itself, does not overburden a servient estate." citing ***Weeks v. Wolf Creek Industries, Inc.***, 941 So.2d 263, 272 (Ala. 2006). The ***Wolf Creek*** Court further noted that "Ordinarily, to support a finding of overburdening, it must be shown that the use has changed in *kind*, rather than *extent*." citing ***Shooting Point***, supra, 576 S.E.2d at 503. This is consistent with the cases concerning the definition of the extent or limits of the take. "Since, as indicated above, the construction rights have been fixed and defined by the plan and profile map and/or the actual construction of the transmission line, any substantial departure there from in the future would constitute an additional taking for which compensation must be paid at that time," See, ***United States ex rel. TVA v. An Easement and Right of Way in Dekalb County, Tennessee***, 182 F. Supp. 899, 902 (M.D. Tenn. 1960, Judge Miller). So, clearly, here there has been a change in the "extent" or "kind" of use such that there has been an overburdening since a new condemnation establishing a different burden, i.e., power line easement, and it ran across the subject basically perpendicular to the pre-existing gas pipe line easement. Mr. Evans use of the term overburden is appropriate.

27.     Mr. Standifer also raised the issue of the use of "paired sales analysis" for purposes of studies and methodology. Paired sales analysis has been defined as "the data derived from comparable properties sold twice within the period of research." This is in essence a before and after. See, ***Tax Increment Financing Commission of Kansas City, Missouri v. Romine***, 987 S.W. 2d 484, 489 (Mo. Ct. App, 1999), citing **Elam v. Alcolac, Inc.**, 765 S.W.2d 42, 218 (Mo.App. W.D.1988). Likewise paired sales has been defined as "use of "**paired sales analysis**, which pairs comparable properties in order to value a point of difference. For example, to decide if the presence of a gravel pit would affect value, a property in the neighborhood of a pit is compared to a similar property without such an influence." See, ***Shelley Materials v.***

*Daniels*, not reported in N.E.2d, 2003 WL 77176 (Ohio. App. 2 Dist.) p. 11.  Paired sales analysis has been further defined as where an appraiser has "performed a detailed **paired sales analysis** by selecting property near external structures such as water towers, power lines or cellular towers, and property which was not, adjusting for any other differences in the pair of properties, and comparing the two types of property in order to measure the effect of the structure on real estate values." See, ***Cellular Telephone Company v. Zoning Board of Adjustment of the Borough of Ho-Ho-Kus***,  24 F. Supp. 2d 359, 371 (D. New Jersey, 1998). At the end of the day, however, it is necessary for the Commission to find a comparable sale or sales to value the property taken. In essence the Commission has found the most closely comparable or paired sales it has available from the evidence presented. Those are  the Zane to Lazy J sale and the Fox to MFP sales. The Commission was not presented with sufficient evidence that the sales called "paired" were truly "paired". The use of paired sales analysis was also only used for the issue of damage outside the right of way on which issue the Commission has received evidence of any number of studies which show that power line easements either have damage outside the easement or they do not.  It is difficult for the Commission to agre**e** that there is no damage to an area which the TVA's own policy says should not have a power line built on it due to possible electro-magnetic fields and the problems associated with them. If they cannot get closer than three hundred feet to an occupied building then an occupied building cannot arguably get closer than three hundred feet to them.    Further the Commission has in the past heard from Mr. Standifer about studies showing damage outside the easement right of way  of 3.0 percent to as much as 53.8 percent to the property as a whole which were referenced in an Appraisal Journal article he cited. He has also agreed that on occasion the studies show there is diminution of value outside the easement. (See, *Tennessee Valley Authority v. An Easement and Right-of-*

*Way Over 1.71 Acres of Land More or Less in Williamson County, Tennessee, Ogden Stokes, et al.*, Case no. 3:07-00486).

28.     Next is the issue of paired sales analysis and its affect on whether a methodology is appropriate or appropriately used. The Government was at great pains to point out that paired sales analysis was the best method to use. The Government has in the past in several cases argued that regression analysis is the best method. There are other acceptable and used methods, such as judgment. But in paired sales analysis, as the Commission understands it, a paired sale may be the same property sold twice, once without the characteristic at issue and once with the characteristic. See, ***Tax Increment Financing Commission of Kansas City, Missouri v. Romine***, 987 S.W. 2d 484, 489 (Mo. Ct. App, 1999), citing **Elam v. Alcolac, Inc.**, 765 S.W.2d 42, 218 (Mo.App. W.D.1988). Or, a paired sale may be two comparable sales one of which has a point of difference and one of which does not. See, ***Shelley Materials v. Daniels***, not reported in N.E.2d, 2003 WL 77176 (Ohio. App. 2 Dist.) p. 11.  If there are any other differences they are adjusted for.  See, ***Cellular Telephone Company v. Zoning Board of Adjustment of the Borough of Ho-Ho-Kus***, 24 F. Supp. 2d 359, 371 (D. New Jersey, 1998). The Commission has difficulty understanding whether Mr. Standifer's paired sales are paired sales or not, and, if so, how they may be different from comparable sales since a true paired sale is also the most comparable sale as noted above in ***Tax Increment Financing Commission of Kansas City, Missouri v. Romine***.

29.     The next issue is the appropriate amount of damages to the landowner. See, ***United States of America ex rel. TVA v. Easements and Rights of Way over 6 Acres of Land***, 117 Fed. Appx. 422, (6th Cir. 2004), (referred to as the ***Steam Mill Ferry*** case, from one of the parties in that case.) There were three factors in the Sixth Circuit's decision. First, what is the accurate measure of compensation? It is the difference  between the fair market value of the

whole tract before and after the taking, citing ***United States of America v. 2847.58 Acres of Land,*** 529 F.2d 682, 686 ( 6th Cir. 1976) Second, and not relevant here, did the evidence support the rate of mining? Third, did the evidence support the idea that areas outside the actual easement were affected See, 117 Fed. Appx. 422 at page 4.

30.     Below is a table summarizing the opinions of the landowner and the appraisers. There will be discussion in the Commission's Report relative to these various damage and value assessments and also an attempt to assess and reconcile the various points of the testimony noted below.  This summary is not the entirety of their opinions but lists the major relevant parts:

| Appraisers/ Landowner | Jones Landowner | Evans | Standifer | Johnstone |
|---|---|---|---|---|
| Highest and best use | Development | Residential Commercial | Development | Development |
| Value per acre | 15,000/acre | 13,500/acre | 11,000/acre-279.9 9,000/acre-54.4 | 8,000/acre |
| Percent of damage | 10%/prop/ As whole | 85%/easement 50%/buffer | 85%/easement 15%/gas/easmnt | 95%/easement |
| Damage to easement | | 84,768 | | |
| Incidental damage | | 280,174/buffer | 6,000/tree rts. | Within 95% |
| Property as a whole | 502,170 | | | |
| Amount due landowner | 502,170 | 364,942 | 65,500 | 54,000 |

31.     The differences of opinion of the witnesses were less than the Commission has seen in some areas and more in others. On initial land value the three expert appraisers had differences of $5,500 per acre or almost forty-one percent (41%). With the landowner included the difference was forty-seven percent (47%). On the amount due the landowner the witnesses ranged from $54,000 to $502,170 or over nine hundred percent (900%) Mr. Jones, the landowner, found damage of $502,170, Mr. Evans found overall damage of $364,942, Mr. Standifer found overall damage of $65,500 and Mr. Johnstone found damage of $54,000. The differences involved the underlying value of the property, the extent to which they should assess

damage outside the take, and the existence and extent of incidental damages. There were substantial differences as to the amount of incidental damage ranging from zero to $6,000 of danger tree rights to $280,174 for a buffer. Further complicating matters Mr. Johnstone indicated he included his incidental damages within his damage amount to the easement area.

32.     There was a large discussion about the gas pipeline easement which was largely unhelpful and minimally significant to the total damage amount. There was an inordinate amount of discussion about the value and extent of the pre-existing gas pipeline easement. All of this occurred over what Mr. Standifer damaged at $311, Mr. Evans damaged at $229, and Mr. Johnstone did not subtract for, as he called it, the "small little area" of the gas pipeline easement. Mr. Jones, the landowner did not mention it either. The discussion about the gas pipeline easement was truly a tempest in a teapot. The plan and profile map identifies an area approximately sixty-one feet wide where the pipe or pipes are buried. There was no competent proof to identify the actual width of the easement as the grant of easement does not and Mr. Jones testified he did the much discussed mowing over the easement and went as wide as he could to the trees. Thus the Commission sees no need to determine the size of the pre-existing gas pipeline easement and in fact cannot as there was no competent proof sufficient to determine it. There was no disagreement that it was a small area, either .223 or .115 acres, comprising no more than $311 of the total damage which at most is one half of one percent of the lowest damage amount. No competent person testified about how many pipelines there were and how wide the easement was.   As noted above, the Commission must be realistic and make its judgment as to what testimony is realistic.  See, *U.S. ex rel. TVA v. Easement in Logan County, Kentucky*, 336 F.2d 76, 80 (6th Cir. 1964), on remand 246 F. Supp. 263, aff'd 375 F.2d 120 (6th Cir. 1967). The Commission accepts that the  value of damage to the pre-existing gas pipeline

easement area within the transmission line right of way is some amount up to $31, but based on the proof submitted that amount is unknown. The Commission cannot speculate given the general lack of truly competent proof. No witness has actually talked to an engineer or pipeline company official with knowledge of the number of pipelines or their location.

33.     Generally a district court's decision to admit or not admit expert opinion and reports is reviewed on an abuse of discretion standard. See, *General Electric Co. v. Joiner*, 522 U.S. 136, 138, 118 S.Ct. 512, U.S.Ga. (1997). *General Electric v. Joiner* was a jury case. Where the factual bases of a study are so dissimilar to the facts of the case at issue it is not an abuse of discretion for a trial court to reject the study. *General Electric, supra*, 522 U.S. at 144-145. "The gatekeeper doctrine was designed to protect juries and is largely irrelevant in the context of a bench trial." See, *Deal v. Hamilton County Board of Education*, 392 F.3d 840, 852 ([6th] Cir. 2004). For that reason the various Parties' requests to disallow expert testimony are disallowed. The Commission consists of experienced trial lawyers who are familiar with expert testimony and its uses and abuses. The Commission has heard these very experts testify many times and has read and re-read the various expert reports and studies. As a general proposition the Commission gives far less weight to studies than it does to the actual comparable sales analysis and particulars of the property in question. The Commission has seen many truly enormous and basically unhelpful studies over the course of its hearings. The Commission has yet to see one that is truly valid or reliable. Noted here is the assertion by the Government that only a "paired sales analysis" is the proper basis for methodology for a study. The Commission has discussed this in Paragraph 19. above and does not deem the attack on Mr. Evans's methodology valid. As a general rule, and here, the Commission lets the impact of the studies go to the weight given to them, rather than serve as a basis for accepting or rejecting outright a given expert's opinion.

34.     Further, the *Instructions to Commissioners*, under which this Commission operates, 61 F.R.D. 503, 506 (E.D. Tenn. 1973, Judge Taylor), have an extensive discussion about the assessment of credibility and the weighing of the evidence. As Judge Taylor noted there, "Expert or opinion testimony is only as good as the facts and assumptions upon which it is based and if such testimony is without any support in the demonstration and physical facts, it is worthless and may be disregarded....  In considering such testimony it is your duty to determine whether such opinion is correct or erroneous, and in arriving at your conclusion you should consider the manner and demeanor of the witness, the bias or lack of bias, the grounds upon which the witness based his opinion, his experience and knowledge of the matters about which he is  testifying, particularly his knowledge of the property, along with other evidence in the case, and the reasonableness or unreasonableness of his opinion as viewed in the light of the knowledge and experience of the witness."

35.     While the studies have been presented there was little testimony or proof about how the studies came to be done, what questions they were addressing and generally the "methodology and explanatory power of the statistical analysis...". *Taylor v. Proctor and Gamble Company*, 178 F. 3d 1296, (Table), 1999 WL 232695 (C.A. 6 (Ohio)) citing, *Simpson v. Midland-Ross Corp.*, 823 F. 2d 937, 944 (6th Cir. 1987). As the *Taylor v. Proctor and Gamble* court stated," Statisticians working from the same corpus of data often disagree at trial on the statistical significance of data - based on collection techniques, sampling methods, groupings, calculations used, control variables, etc." *Ibid.*  There were a number of questions from counsel as to whether or not a paired sales analysis was proper if the sales paired did not look at property before imposition of a power line easement and after imposition or whether the sales were truly "paired".  There was significant disagreement over what the variables should be, as noted at

length in cross examination For a statistical study to "contribute anything of value" it is necessary that "the data base numerically mirrors reality. If it does not in substantial degree mirror reality, any inferences empirically arrived at are untrustworthy." See *McCleskey v. Kemp*, 481 U.S. 279, 107 S.Ct. 1756, 1765 (1987) citing *McCleskey v. Zant*, 580 F. Supp. 338, 353-360 (N.D. Ga. 1984). Based on the various cross examinations this was especially troubling to the Commission since there was little, if any, clarity about exactly what reality the database mirrored.

36.    The Commission is bound by Judge Taylor's admonition in the *Instructions*. The Commission must consider the grounds upon which the witness bases his or her opinion and if they do not exist may disregard it. In the Commission's view none of the proffered case studies adequately controlled variables. The Commission does not question their expertise, only the weight to be accorded such "studies".

37.    In this case, the Commission believes the assessment of value issue has two parts, using the method allowed in the *Instructions* of assessing the damage to the land as a whole. The first of these is what is the underlying value of the property.  The second is the amount of damage to the property as a whole.

38.    The Commission participates in a view for a reason. The reason is to "enable them (Commissioners) to better understand and weigh testimony which they hear." The Commission may 'take into consideration what you (Commissioners) will see on the view; and you will base your awards on both the view and the testimony you will hear." See, ***Instructions***, p. 3. The Commission was able to see at the view the observability of the power lines, the area where the power line easement crossed the gas pipe line easement, the closeness of the easement to the boundary in the western portion of the subject property as it interacted with the terrain, the

extensive road frontage, the lack of any credible basis for asserting a neck or limited access to the western portion of the subject, the general location of the gas pipe line, the existence of guy wires outside the easement and other factors.

39.     A landowner's testimony as to the value of his property is not always sufficient testimony on which a verdict can be based. It is not acceptable for the landowner to show "that his plans have been frustrated by the taking of his property, or what the land was worth to him, because these are all matters which are personal to the owner and do not have a bearing on the market value of the property or the compensation to which the owner is entitled." See, *Instructions*, p. 4. There must be a basis for the landowner's valuation, and when the landowner's own testimony shows that his valuation has no probative value, the court may determine that the landowner's testimony alone is insufficient to support a jury verdict. *Sowards,* 370 F.2d at 92 ("[W]here the presumption of the owner's special knowledge is negated by his own testimony, his opinion has no probative value and is insufficient to sustain the award."); *see also Kestenbaum,* 514 F.2d at 698-99; *Klapmeier v. Telecheck International, Inc.,* 482 F.2d 247, 253 (8th Cir.1973). A landowner's opinion must have probative value and have a relationship to market value. See, *United States v. 901.89 Acres of Land*, 436 F.2d 395, 399-400 (6th Cir., 1970) citing *United States v. Trout*, 386 F.2d 216, 223, n. 10,(5th Cir. 1967). Here, the landowner's testimony as to damages to land value was not consistent with the damages found by the various appraisers. While the landowner's testimony has weight as noted in the Instructions, the Commission is not required to accept it. The Landowner relied on one comparable, the Escue to Robertson County sale of the new school property. That sale did not seem totally arms length as it had a special financing condition valuable to the landowner and was less comparable due to it s

time of sale. Hence the Commission cannot credit that portion of the landowner's testimony which was completely inconsistent with the appraisers' testimony.

40. What the Commission was able to observe at the view also affected its ability to accept, or not Mr. Standifer's discussion of a separate parcel of fifty-four acres. His discussion of access issues was flawed as there was clearly access from Mt. Pleasant Road to the south. The so called "neck" was a flawed concept from the start as there was no limit on the width or location of access to the fifty-four acres. The Commission spent several hours viewing the property and drove and walked all over it. The creation of a separate parcel, whether on tax maps or not was not justified in this case. It clearly was inconsistent with the larger parcel rule and was inconsistent with Mr. Johnstone's use of a single parcel and Mr. Evans use of the larger parcel.

41. As a result the Commission partially credits Mr. Evans, Mr. Johnstone's and Mr. Standifer's testimony. Thus total damages varied from $54,000 to $364,942 from the appraisers to $502,170 by the landowner. This is an approximate 675% difference for the appraisers. The Commission is not required to accept either the high or low testimony but may form its own judgment as to the total loss occasioned by the take. The Commission must be realistic and make its judgment as to what testimony is realistic. See, *U.S. ex rel. TVA v. Easement in Logan County, Kentucky*, 336 F.2d 76, 80 (6th Cir. 1964), on remand 246 F. Supp. 263, aff'd 375 F.2d 120 (6th Cir. 1967). Testimony which is unreasonable and would, to the Commission's own knowledge, be inconsistent may be disregarded. See, *Instructions to Commissioners*, 61 F.R.D. 503, at 507-508. The fair market value for the highest and best use of the property is the generally accepted standard for determining "just compensation" if the property is taken by condemnation. See, *United States v. 1,291.83 Acres of Land*, 411 F.2d 1981 (6th Cir. 1979). Further, "[C]omparability is a function of three variables: the respective characteristics of the

properties, their geographic proximity to each other, and the closeness in time of the sales."

*United States v. 68.94 Acres of Land,* 918 F.2d 389, 399 (3d Cir .1990); Unif. Appraisal Standards 47 (specifying nine "basic elements of comparison": property rights conveyed; financing terms; conditions of sale; market conditions; location; physical characteristics; economic characteristics; use and zoning; and non-realty components of value included in the sale property). The court's authority under Fed.R.Civ.P. 71A(h) to exclude evidence of sales of dissimilar properties is affirmed with regularity. "The questions of whether [comparable sales] transactions are near enough in time, or involve substantially similar lands, or significant amounts of land are all questions of the remoteness of the evidence offered and in consequence are for the trial court." *Baetjer,* 143 F.2d at 397. Since no two pieces of land are ever exactly alike, "parcels may only be compared where the dissimilarities are reduced to a minimum and allowance made for such dissimilarities…There is no basis, however, to rely on patently remote transactions when more comparable sales are available. *Cf. United States v. 100 .80 Acres of Land,* 657 F.Supp. 269, 274 n. 7 (M.D.N.C.1987) ("The record supports that the [subject property] is unique in its location and relation to the market, and therefore, that no comparable sales exist.")." See*, U.S. v. 10.082 Acres of Land*, No. CV05-00363-PHX-NVW, 2007 WL 962846, page 4 of 12, ( D. Ariz. 2007, Judge Wake). For the reasons noted above, the Commission deems the Fox to MFP sale and the Zane to Lazy J sales as the two most comparable. Zane was extremely close in time but remote in distance and clearly not part of the White House market. Fox was more remote in time but closer and part of the White House market. Fox was before the property market decline starting in 2007, but that decline has somewhat reversed as Mr. Evans noted. Hence the Commission cannot accept the Zane price per acre of $9,123 as it is too low, however, the Commission cannot totally credit the Fox price of

$19,305b per acre as it was before property values decreased, as all agreed. Mr. Evans suggested a price per acre of $13,500. Mr. Parrish suggested prices per acre of $11,000 and $9,000. Mr. Johnstone suggested a price per acre of $8,000, which is less than his best comparable which is almost identical in time. The Commission, based on its own knowledge has formed the judgment that the underlying value of the property as a whole is $11,000 per acre, as suggested by Mr. Standifer for the larger portion of the property. Mr. Standifer gave no credible reason for dividing the property into two parts.

42.    The size, scope and visual impact of this power line, as observed at the view, as documented by the photographs in evidence and as explained and described by the witnesses, is very significant. That significance is amplified by the fact that the easement is at the center of the property and is visible from the roads and all the property, as observed at the view. For instance the line is clearly visible from Mt. Pleasant Road as observed in the view. The significance is further amplified because there is a pre-existing gas pipe line easement going across the property roughly from south to north and going under the powerline easement roughly in the middle of the property. These two easements roughly divide the property into quarters and in combination affect development potential. As noted above, The Commission is not required to accept either the high or low testimony but may form its own judgment as to the total loss occasioned by the take. The Commission must be realistic and make its judgment as to what testimony is realistic. See, *U.S. ex rel. TVA v. Easement in Logan County, Kentucky*, 336 F.2d 76, 80 (6th Cir. 1964), on remand 246 F. Supp. 263, aff'd 375 F.2d 120 (6th Cir. 1967). Testimony which is unreasonable and would, to the Commission's own knowledge, be inconsistent may be disregarded. See, *Instructions to Commissioners*, 61 F.R.D. 503, at 507-508. Also as noted above the Commission must make its own assessment of credibility. The

Commission credits the percentage assessment of damage to the entire property, including so called "buffers" stated by Mr. Evans with two modifications based on the Commission's "own knowledge", the view, and certain inconsistencies. First the Commission, as noted above the Commission deems the underlying value of the property to be $11,000 per acre based on the two comparables noted above. Second the Commission accepts Mr. Evans' assessment of damage to a "buffer" with the exception that, as Mr. Evans noted in cross examination, his buffer extends outside the three hundred design constraint by fifty feet as he starts his buffer at the edge of the easement rather than the power line centerline. This yields a total compensation due calculated as follows. Total value of the 334.78 acres before the take is $3,682,580. Total damage to the take of 7.11 acres, calculated as 6.995 acres due to gas pipeline crossing, at ninety percent is $69,250, for a total damage to the power line easement area of $69, 250.00. Total incidental damage to areas outside the take is calculated as 42.3 acres, minus .1666 (16.66%), due to an incidentally damaged area outside the easement based on the design constraint, electro-magnetic fields, and diminution of view not being calculated from easement centerline, or base area outside the easement incidentally damaged of 35.25 acres. This area is damaged at fifty percent based on Mr. Evans' calculations. This yields incidental damage of $193,875.00. Total damages to the property as a whole are $263,125.00.

43.    The Commission credits the assessment of all appraisers and the landowner that there is diminution of value to the property based on "apprehension of injuries to person or property by the presence of power lines on the property (which) is based on practical experience and may be taken into consideration in so far as the lines and towers affect the market value of the land." *See, Hicks v. United States for the use of the Tennessee Valley Authority*, 266 F.2d 515, 520 (6th Cir. 1959). This analysis was affirme*d in United States ex rel. TVA v. Easement*

*and Right-of-way*, 504 F.2d 305, 309 (6th Cir. 1968). It must be demonstrated that there is an actual profitable use or a market demand for the prospective use. *See, United States v. Easement and Right-of-Way 100 Feet Wide*, 447 F.2d 1317, 1319 (6th Cir. 1971). All appraisers and landowners agreed that the new easement affected the value of the property. All agreed it was commercial property. All agreed the road location was affected.

44.     It is further clear from the testimony of the witnesses that the land has the potential of residential now as all agreed. That potential may be used as a basis for a just compensation award. See*, U.S. ex rel. and for the use of TVA v. Hughes*, 251 F. Supp. 930 (E.D. Tenn 1966).

45.     The Commission is then confronted with the issue of the amount of  damages to the property. The Commission's award of loss of value, however, is to be for the fair and reasonable value of the property as a whole. See, *Instructions to Commissioners*, 61 F.R.D. 503, 514 citing *United States v. Myer*, 113 F.2d 387 (7th Cir. 1939), cert. denied, 311 U.S. 706, 61 S.Ct. 174, 85 L.Ed. 459 (1940).   Testimony which is unreasonable and would, to the Commission's own knowledge, be inconsistent, may be disregarded. See, *Instructions to Commissioners*, 61 F.R.D. 503, at 507-508.  The Commission does agree that there is damage from the public apprehension of power lines as noted in *Hicks, supra*.  Likewise the Commission may consider as damage the unsightliness of towers and transmission lines in the locality as well as changes in the character of the ground which arises from such clearing. See, *U.S. v. Robertson*, 354 F.2d 877, 880-81 (5th Cir. 1966).  See also, *Easement in Logan County, supra*. The landowner  had the burden of proving the fair market value of the condemned land. *United States ex rel. and for Use of T.V.A. v. Powelson, 319 U.S. 266, 273, 63 S.Ct. 1047, 87 L.Ed.*

*1390, 1396-1397 (1943); United States v. 1291.83 Acres of Land, 411 F.2d 1081, 1084 (6th Cir. 1969).*

46.     The Commission is then confronted with the question of what damage is realistic. There is disagreement as to the amount and basis for incidental damages. The Commission must be realistic and make its judgment as to what is realistic. The Commission has formed its own judgment, based on the testimony of the witnesses, as to the loss occasioned by the take. See, *U.S. ex rel. TVA v. Easement in Logan County, Kentucky*, 336 F.2d 76, 80 (6th Cir. 1964), on remand 246 F. Supp. 263, aff'd 375 F.2d 120 (6th Cir. 1967). Testimony which is unreasonable and would, to the Commission's own knowledge, be inconsistent may be disregarded. See, *Instructions to Commissioners*, 61 F.R.D. 503, at 507-508. As noted above the Commission has assessed damages of $263,125.00. The Commission partially credits various portions of the testimony as noted above.

47.     Based upon all of the evidence produced at the hearing on this matter, aided by personal examination of the property in the presence of the parties and their attorney, the Commission is of the opinion that the calculation of damages, as of the date of taking, assuming a seller under no compulsion to sell and a buyer under no compulsion to buy, neither of whom is compelled to do so, and both of whom were in possession of all the known facts, using the method of calculating the damage to the exact area covered by the easement and adding any incidental damages to the remainder, as assigned by the *Instructions*, is as follows: damages to the area of the easement itself are $69,250.00, incidental damages to the area outside the easement are $193,875.00 and as a result  damages to the entire property are $263,436.00. Therefore total damages are $263,125.00.  Hence, the Commission respectfully reports that the just compensation due the landowner(s) is $263,125.00.

Respectfully submitted,


_____
              s/ William H. Farmer
William H. Farmer, Chairman


_____
              s/ Jack W. Derryberry, Jr.
Jack W. Derryberry, Jr., Commissioner


_____
              s/ Horace Johns
Horace Johns, Commissioner



## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing Report of the Commission has been served by the CM/ECF system to to Mr. Edwin W. Small, Assistant General Counsel, Tennessee Valley Authority, 400 West Summit Hill Drive, Knoxville, Tennessee 37902-1401; Mr. Philip Pfeifer, Attorney, Tennessee Valley Authority, 400 West Summit Hill Drive, Knoxville, Tennessee 37902-1401, and Mr. Clark Tidwell, 150 Fourth Avenue North, Suite 1850, Nashville, TN 37219 on this the 30th day of November, 2011.


By: ____s/ William H. Farmer_____